**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1236-24

HELEN GRAHAM,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

DAYTONA AUTO SALES, INC.,
JOHN E. VELEZ, and JACKELINE
VELEZ,

      Defendants-Appellants/
      Cross-Respondents,

and

PROGUARD WARRANTY
PLUS, INC.,

      Defendant.

_____

Argued April 15, 2026 – Decided August 4, 2026

Before Judges Currier, Berdote Byrne and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8438-21.

Kyle Vellutato argued the cause for appellants/cross-respondents (O'Toole Scrivo, LLC, and Pfund McDonnell, PC, attorneys; Kyle Vellutato, of counsel and on the briefs; Amy H. Sachs and Nicholas Fromhold, on the briefs).

Javier L. Merino argued the cause for respondent/cross-appellant (The Dann Law Firm, PC, and Kim Law Firm LLC, attorneys; Javier L. Merino, Andrew R. Wolf, Mark Jensen, and Yongmoon Kim, on the briefs).

PER CURIAM

Plaintiff sought class action certification after she purchased a used car from defendant Daytona Auto Sales, Inc. and experienced mechanical issues. Plaintiff asserted that Daytona, and its co-owners, defendants John and Jackeline Velez, unlawfully charged a documentary fee to its buyers by failing to itemize the services performed and the price for each service performed in its sales documents in violation of the Automotive Sales Practices (ASP) regulations, N.J.A.C. 13:45A-26B.3(a)(2); the New Jersey Consumer Fraud Act (CFA), N.J.S.A. 56:8-1 to -33; and the Truth-in-Consumer Contract, Warranty and Notice Act (TCCWNA), N.J.S.A. 56:12-14 to -18, predicated on violations of the ASP regulations and the CFA.

A-1236-24

The court granted class certification as to Daytona and John[1] but denied certification as to Jackeline. The trial court designated plaintiff as class representative. Defendants appeal, contending the court abused its discretion in granting class certification. Plaintiff cross-appeals from the order, asserting the court abused its discretion in denying certification as to Jackeline.

After reviewing the parties' contentions in light of the facts and applicable principles of law, we affirm the order granting plaintiff's motion for class certification as the court properly considered the elements required under Rule 4:32-1(a) and (b) to certify the putative class. We reverse in part the portion of the order denying class certification as to Jackeline.

I.

In 2019, plaintiff purchased a 2008 Mercedes-Benz M-Class from Daytona, for a total price of $6,480 which included a $280 document fee and a $229 warranty from defendant ProGuard Warranty Plus.

Plaintiff signed a Buyer's Order that itemized five separate fees incidental to the sale: (1) a title fee; (2) DMV fees; (3) Doc fees; (4) Lien fees; and (5) Vendor's Single Interest Insurance. The line items for "Title Fee" and "DMV

---

[1] Since the Velez's share a surname we refer to them by their first names for the reader's ease.

A-1236-24

Fees" were listed as "n/a" because plaintiff chose to prepare and process her own title, DMV and registration paperwork, rather than pay Daytona to perform those services.

At the time of the sale, plaintiff also signed and/or received a ProGuard Warranty Service Contract Application, a Buyer's Guide, a Waiver of Limited Warranty, Certificate of Title, and CarFax vehicle history report. Plaintiff also executed a "statement of purchase" which identified that the vehicle was being sold "as is." The statement of purchase further provided that

> in consideration of the low selling price of this vehicle, I am accepting the said vehicle without any guarantees as to its condition. Upon my acceptance of said vehicle, I will not hold the above mentioned seller or any of its agents liable for anything that may happen to the vehicle anytime in the future.

The Buyer's Order and other documents related to the sale were prepared using Integex Solutions Inc's software and forms, which Daytona began licensing in 2019.

In December 2021, plaintiff filed a complaint against Daytona and ProGuard, alleging the car's engine shut down seven days after the purchase, and plaintiff could not start the car. Plaintiff stated she "went to the dealership and requested her money back. A dealership representative refused to refund her the money and told her to contact ProGuard."

4

Plaintiff alleged that she called ProGuard and "complained about the defective car." She was instructed to bring the car to a specific auto repair shop. Plaintiff stated she "paid a towing company to transport the car to [the repair shop] and left the car overnight." "The next morning, a mechanic at [the repair shop] replaced broken hoses and the car started again." However, according to plaintiff, "the 'check engine light' appeared on the dashboard" as she drove home.

Plaintiff took the car back to the repair shop several times over the next two weeks, after experiencing continuing difficulty starting the car and the "check engine light" reappearing on the dashboard. According to plaintiff, on January 22, 2020, a mechanic at the repair shop "ran diagnostics testing and advised her in writing that the car need[ed] a 'new or used good condition engine.'"

Plaintiff asserted she sent two notices of revocation of acceptance to Daytona, requesting "cancellation of the contract, [and] a refund of the purchase price of $6,909.30, which included $229 for the ProGuard Warranty and $280 document fee, plus $1,423.10 she had spent on repairs to the car."

Plaintiff alleged that John Velez "refused to take back the car and issue a refund" stating the car was sold "as is" and Daytona sold it to plaintiff "with a

5

written warranty" from ProGuard. Although plaintiff notified ProGuard of the vehicle's defects she did not file a claim with the company.[2]

In August 2022, plaintiff filed an amended class action complaint asserting violations of the ASP, CFA, TCCWNA, and Uniform Declaratory Judgments Act (UDJA), N.J.S.A. 2A:16-50 to -62, pursuant to her class action complaint, and violations of the Uniform Commercial Code, N.J.S.A. 12A:2-101 to 2A-532, and the New Jersey Used Car Lemon Law, N.J.S.A. 56:8-67 to -80.1, and CFA as they relate to plaintiff individually. Plaintiff contended defendants violated the ASP, CFA, and TCCWNA by charging its buyers a documentary fee service and failing to itemize the services performed and the price for each service.

Defendants' answer to the complaint admits plaintiff's allegation that "[t]he Buyer's Order . . . fails to itemize what services are being provided or the price for each service and also fails to itemize which services are optional or that may be performed by the Customer, or the price being charged for those services."

Plaintiff submitted a statement of damages pursuant to Rule 4:5-2, advising, specifically as to the CFA claim, she suffered

---

[2] The court dismissed ProGuard from the case on January 20, 2023.

6

ascertainable losses including, but not limited to . . . (a) the cost of the ProGuard service contract; (b) the cost of repairs to the [vehicle]; (c) the diminished value of the [vehicle] a[t] the time it was sold to [p]laintiff; and (d) the total amount that [p]laintiff paid for the [vehicle].

A protracted discovery period then ensued, during which plaintiff filed numerous motions to compel defendants to answer class-related discovery demands and deposition questions. Defendants also filed a counterclaim and third-party complaint against Integex.

According to defendants' answers to interrogatories, the "document fee incorporates expenses involved in the paperwork aspects of the sale of a motor vehicle, including but not limited to clerical costs, computer costs and document delivery fees."

John testified that from 2016 to when Daytona closed in 2023, he "managed the day-to-day operations," advising he "doled out the work to everybody and supervised them." He acknowledged the $280 document fee charged to plaintiff was comprised of three different services, although Daytona failed to itemize the different services and price for each service. John testified the "clerical fee" comprised $130 of the $280 document fee and consisted of "prepar[ing] all the title work," "help[ing] to get the insurance," "[p]reparing all the documents," "printing everything out," and "getting everything together."

7

John did not specify how he decided to charge $130 for this service but emphasized that the charge reflects "everything it takes to complete [the sale]" asserting that "it's all about how much time it takes." When asked how much Daytona charges per hour to complete each of the tasks referenced above, John replied that he "do[esn't] have it broken down into a specific number" and he "just know[s] what it takes to get the deal processed." John stated he calculated the average cost for this type of deal and services provided in the past and then charged that average to plaintiff when she purchased the vehicle.

Addressing the $90 "document delivery fee and preparation [charge]" that was part of the $280 document fee, John testified it was the cost of

> [p]ut[ting] all the information in the system, print[ing] it out, hav[ing] her go over it, hav[ing] her sign it. Prepare other documents . . . like the warranty and all that other stuff, and . . . just prepare it ready to be delivered. . . . Preparing her insurance, preparing her warranty contract, all that.

John testified that the "document delivery fee and preparation [charge]" differs from the "clerical fee," as the "clerical fee is the person that's in charge of . . . going over all the documents . . . . The clerical fee is the person behind analyzing everything, everything is correct." He stated that the "document delivery fee and preparation [charge]" is "[j]ust preparing everything. Like

A-1236-24

getting everything done and then preparing it . . . . Print them, prepare them, make sure they're correct . . . and she has to sign them, and then we hand them."

According to John, Daytona charged plaintiff $60 for a computer fee for its use of Autofunds, AutoCheck, CARFAX, and for the service paid to the "temp tag company." He conceded that $60 is an average cost as "the CARFAX is like an average of $20. The AutoCheck is an average of $20. You know, it all depends. The tag fee is, like, $7 and then you add another [$]15. So it all depends." When asked what he meant by "you add another [$]15," John replied it would depend on whether the person was a resident of the state but did not specify how that would change the cost of the license plates and the temporary tag.

Defendants also provided sales records from January 1, 2017, to March 2023, totaling approximately 1,000 transactions. Plaintiff's counsel prepared a spreadsheet summarizing the transactions, which contained the following data: A. The Bates number corresponding to the location of the deal; B. Date of the transaction; C. Contract number, if listed; D. Total "Doc fees" charged; E. "Title" fees charged; F. "Tag/registration" fees charged; G. "Temp tag" fee charged; and H. "Prep fee[s]" charged.

A-1236-24

Following the close of discovery, plaintiff moved for class certification. In support of the motion, plaintiff submitted the spreadsheet. Plaintiff's counsel certified that a review of the discovery revealed that "[d]efendants' unitemized fee practices [were] generally broken down into three buckets." Counsel stated:

> The first bucket consists of [d]efendants' practice of charging its customers a fee to title and register a vehicle which were higher than the official fees charged by the state department of motor vehicles. As [d]efendants testified, the fee they charged their customers included a fee that [d]efendants paid a company to obtain the title and registration documents for its consumers. Defendants could not recall an instance where they refunded this overcharge. The amount [d]efendants charged to their customer always included the fee for the third-party agency [d]efendants hired to assist in getting the title and registration. In [plaintiff's counsel's] review of the transaction documents provided, [plaintiff's counsel] determined that there were 612 transactions where the same or similar sales document that was used in [p]laintiff's transaction was also used and where each consumer was charged a similar title or registration fee.

> The second bucket consists of fees [d]efendants assessed marked as "Doc fees" or other similarly denoted fee where the sales document used in the transaction likewise did not set forth in writing each specific service performed or the price for each specific service performed for the fees charged. For example, in [plaintiff's] transaction, the fee was marked as "Doc fees." Meanwhile, in other transactions, the fee was connoted with two asterisks (**). Defendants testified in their deposition that the (**) fee was also a Doc fee.

A-1236-24

There were other variations of the same fee, such as "**Doc Fee" and "Doc Fee"[].

The third bucket consisted of fees [d]efendants assessed marked "Dealer Prep" or other similarly denoted fee where the sales document used in the transaction likewise did not set forth in writing each specific service performed or the price for each specific service performed the "Prep" fee charged. Daytona testified that the dealer prep fee consisted of "getting the car prepped for that sale," and the services could include "a car alarm," "an accessory," or "mudguards or exhaust." Daytona admitted that by looking at the Buyer's Order, it could not tell what services were provided in exchange for the "Prep fee."

[(Internal citations omitted).]

Plaintiff also submitted four sample buyer's orders, including hers, in support of the motion for class certification. The orders contained different itemized charges. Two of the sample buyer's orders were created using software/forms Daytona licensed prior to plaintiff's purchase of the vehicle and two were created using Integex's software.

A buyer's order dated March 4, 2017, contained a charge of $195 for ** which corresponded to a footnote, stating:

**TH[IS] IS NOT AN OFFICIAL FEE AND IS NOT REQUIRED BY LAW BUT MAY BE CHARGED BY A DEALER. THIS ADMINISTRATIVE FEE MAY RESULT IN A PROFIT TO DEALER.

11

NO PORTION OF THIS ADMINISTRATIVE FEE IS FOR THE DRAFTING, PREPARATION, OR COMPLETION OF DOCUMENTS OR THE PROVIDING OF LEGAL ADVICE.

An October 29, 2019 buyer's order contained identical language regarding a charge of $395 for **Doc Fee.

During his deposition, John stated that the $195 fee listed in the March 4, 2017 buyer's order included the delivery fee, clerical fee, and computer fee. He conceded this contradicts what is described in the footnote on the order.

On December 11, 2024, the court granted plaintiff's motion for class certification as to Daytona and John pursuant to Rule 4:32-1(b)(3) and (b)(2) regarding plaintiff's claims under the CFA, TCCWNA, and the UDJA, and denied certification as to Jackeline. The order defined the class as:

> All persons who purchased or leased a motor vehicle from Daytona at any time on or after the day six years prior to the date this Amended Complaint was filed who received a sales document the same or similar to the Buyer's Order used in the transaction with [p]laintiff where they were charged a "Doc["] fee[], or similar fee where the sales document used in the transaction did not set forth in writing each specific service performed or the price for each specific service performed for the fees charged.

The Class Period was further defined as "the period beginning January 1, 2017 (to exclude consumers whose CFA and TCCWNA claims would be barred

12

by the applicable six-year statute of limitations) and end February 15, 2023 (the last recorded transaction defendants have before they sold the dealership)."

The order appointed plaintiff as "[c]lass [r]epresentative" and designated plaintiff's counsel as "[c]lass [c]ounsel."

II.

On appeal, defendants contend the trial court erred in: permitting plaintiff to file an untimely motion for class certification; granting class certification because plaintiff cannot demonstrate a violation of the CFA or TCCWNA; and in granting certification because plaintiff did not establish the threshold requirements of Rule 4:32-1(a) and (b).

In her cross-appeal, plaintiff asserts the court erred in denying class certification against Jackeline.

"In general, an appellate court reviews a trial court's class action determination for abuse of discretion." Dugan v. TGI Fridays, Inc., 231 N.J. 24, 50 (2017). "When an order granting or denying class certification is reviewed on appeal, the 'appellate court must ascertain whether the trial court has followed' the class action standard set forth in Rule 4:32-1." Ibid. (quoting Lee v. Carter-Reed Co., 203 N.J. 496, 506 (2010)). "[Q]uestions of law related to class certification are reviewed de novo." Myska v. N.J. Mfrs. Ins. Co., 440 N.J.

Super. 458, 473 (App. Div. 2015) (citing <u>Int'l Union of Operating Eng'rs Loc.</u> <u>No. 68 Welfare Fund v. Merck & Co.</u>, 192 N.J. 372, 386 (2007)).

A.

Defendants assert that plaintiff's motion for class certification was untimely and prejudicial because it was filed more than two years after the amended class action complaint was filed. Defendants rely on <u>Rule</u> 4:32-2(a), which provides that "[w]hen a person sues . . . as a representative of a class, the court shall, <u>at an early practicable time</u>, determine by order whether to certify the action as a class action."

In considering this argument, the trial court stated:

> [Plaintiff] [was] only able to obtain the information required to determine the potential class after several discovery motions requiring compliance, including a motion to compel the deposition of [d]efendant John Velez. The discovery was not provided by [d]efendants until April 2024, and [plaintiff] then had to review and analyze same for purposes of the subject motion. Defendants were certainly aware that [plaintiff] [was] seeking class certification since the inception of this matter and the [c]ourt did not enter any deadline for the filing of the motion for class certification. The [c]ourt finds that [p]laintiff acted in this matter with reasonable diligence in obtaining the information required for the filing of the subject motion[.] Further, the [c]ourt notes that [d]efendants did not move to amend their [a]nswer to assert a [counterclaim] and [third-party-complaint] until April 24, 2024. In June 2024, Integex then filed a

14

[m]otion to dismiss which adjourned and ultimately was denied in October[] 2024. Accordingly, [d]efendants contention that it has been prejudiced by the "delay" in the filing of this motion and the idea that [d]efendants were prepared to proceed with trial while the motion to certify the class was being prepared and the [third-party defendant] was only recently brought into the case [is] not persuasive.

We are satisfied with the court's analysis of the circumstances surrounding discovery including defendants' noncompliance with plaintiff's demands. Indeed, if there were any prejudice, and we see none, it resulted from defendants' refusal to respond to plaintiff's repeated requests for discovery.

B.

Defendants further contend the trial erred in granting class certification because the buyer's order did not violate the ASP regulations. Therefore, there was no "per se" violation of the CFA and TCCWNA. Our analysis reflects defendants are putting the cart before the horse.

In Lee, the Supreme Court specifically instructed that

[i]n deciding whether to grant or deny class certification, a trial court does 'not decid[e] the ultimate factual issues' underlying the plaintiff's cause of action. Rather, at the class-certification stage, a court must 'accept as true all of the allegations in the complaint,' and consider the remaining pleadings, discovery (including interrogatory answers, relevant documents, and depositions), and any other pertinent evidence in a light favorable to plaintiff . . . .

15

> [203 N.J. at 505 (Alteration in original) (internal citations omitted).]

The rigorous analysis sought by defendants is conducted by the trial court to determine whether plaintiff has met the elements of Rule 4:32-1. However, this analysis does not entail a decision regarding the merits of the complaint at this point. See Delgozzo v. Kenny, 266 N.J. Super. 169, 180 (App. Div. 1993) (holding that "[w]hen determining whether a class should be certified, a court is not to make a preliminary determination of the merits of the underlying claims.").

## C.

We turn then to the court's analysis of the governing Rule 4:32-1(a), which provides that

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

### i.

In addressing Rule 4:32-1(a)(1), the trial court cited the applicable case law and stated:

16

Plaintiff has defined the class as "[a]ll persons who purchased or leased a motor vehicle from Daytona at any time on or after the day six years prior to the date this Amended Complaint was filed.["] The Amended Complaint that included the class claims was filed on August 8, 2022. Therefore, the class period is defined. Plaintiff has established that there are 852 members of the class consisting of consumers who were charged doc fees by Dayona. This number is arrived at from Daytona's sales records, which showed these consumers were charged unitemized documentary service and pre-delivery service fees. Defendants do not dispute [p]laintiff's claims of numerosity. Further, based on the documents produced during discovery, [p]laintiff contends that each documentary service and pre-delivery service fee was in an amount similar to [p]laintiff's. Thus, there are numerous documentary fees charged in small amounts not warranting recourse through litigation. To join all 852 claims would be impracticable, inconvenient, and a waste of judicial resources. Accordingly, the [c]ourt finds that [p]laintiff has satisfied the first prong of numerosity.

The court did not abuse its discretion in finding this first element. Plaintiff established that it would be impracticable to join all the class members as the individual claims of class members involve relatively small amount of damages (each class member alleges between $71.85 to $2,819.90 in unlawful fees).

ii.

The trial court then considered the element of commonality under Rule 4:32-1(a)(2), stating:

To prove commonality, there must be questions of law or fact common to the class under Rule 4:32-1(a)(2). However[,] "not all questions of law or fact raised need be in common." Weiss v. York Hosp., 745 F.2d 786, 808-09 (3d Cir. 1984). A single common question may be sufficient. See Delgozzo, 266 N.J. Super. at 185. If the "plaintiff's claims are grounded essentially in the contractual relationship," there are common questions of law and fact "even though some variances exist in the virtually identical agreements." Lusky v. Capasso Bros., 118 N.J. Super. 369, 372 (App. Div. 1972). See generally Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 545-46 (D.N.J. 1999) (common questions involved car dealer's common practice of failing to disclose to consumers information on its standardized retail installment contracts).

The [c]ourt finds that the evidence presented establishes that an unitemized documentary fee was charged to numerous consumers, whether by sale, lease financing, or otherwise. The fees are not properly itemized with a description of the services as required and these unitemized fees appear on the contract identified by [p]laintiff. As such, there are common questions of law and fact between [p]laintiff as the class representative, and the proposed class members. Plaintiff has met the second prong of commonality.

[(Citations reformatted).]

In Lusky, 118 N.J. Super. at 372, we stated that if "plaintiffs' claims are grounded essentially in the contractual relationship[] . . . there are questions of law and fact common to the class even though some variances exist in the virtually identical agreements." Here, plaintiff's claims are grounded in

18

contractual sales forms that are common to the entire class. There are common questions of law and fact that connect plaintiff and the putative class based on defendants' failure to adequately itemize fees in motor vehicle transactions.

iii.

Defendants contend that plaintiff failed to demonstrate typicality under Rule 4:32-1(a)(3) because plaintiff's experience was atypical of other consumers in the putative class. Defendants assert that "the very fact that [p]laintiff did not purchase 'pre-delivery services'—such as vehicle modifications—demonstrates that her claims are not typical of the class the trial court approved."

The trial court found that plaintiff established typicality under Rule 4:32-1(a)(3), stating:

> To demonstrate "typicality," a plaintiff must show that the claims of the class representative have the essential characteristics common to the claims of the class. In re Cadillac V8-6-4 Class Action, 93 N.J. 412, 425 (1983). The claims of a class representative are generally found to be typical of the class's claims if they arise from the same course of conduct that gives rise to the claims of the other class members and if the claims are based on the same legal theory. Ibid.[;] see Cannon, 184 F.R.D. at 544. When "the same unlawful conduct was directed at or affected both the named [p]laintiff and the members of the putative class, the typicality requirement is usually met, irrespective of varying fact patterns that may underlie individual claims." Cannon, 184 F.R.D. at 544. "[S]ince the claims only need to share the same essential characteristics, and need not be

19

identical, the typicality requirement is not highly demanding." Laufer v. U.S. Life Ins. Co., 385 N.J. Super. 172, 180 (App. Div. 2006) (quoting 5 Moore's Federal Practice § 23.24[4] (3d ed. 1997)).

Here, the [c]ourt finds that the claims of [p]laintiff, as the class representative, have the essential characteristics common to the claims of the class because her claims arise from [d]efendants' same course of conduct in not itemizing the documentary fee in violation of the ASP [r]egulations, to other class members.  The [c]ourt does not find persuasive [d]efendants' argument that [p]laintiff cannot establish that her claims are typical because other members of the potential class were charged fee[s] for additional services such as a car alarm, accessories, mud guards, or exhaust.  Defendants further contend that there is a purported difference if the transaction is a lease or sale and if financing is required.  The [c]ourt does not agree. . . . Plaintiff has met the third prong of typicality.

[(Second alteration in original) (citations reformatted) (paragraph break added).]

The trial court correctly concluded that plaintiff established typicality under Rule 4:32-1(a)(3).  Plaintiff's claims have the essential characteristics common to the class and her claims arise from defendants' course of conduct regarding the failure to itemize the documentary fees.  As we have stated, typicality only requires that the claims share the "same essential characteristics" without being identical in all aspects.  Laufer, 385 N.J. Super. at 180.

iv.

Defendants argue the trial court "erred by analyzing only the adequacy of [p]laintiff's representation rather than evaluating her representation 'coupled with the typicality of [p]laintiff's claims,' and by failing to consider the untimeliness of [p]laintiff's [m]otion."

The trial court found plaintiff established adequacy under Rule 4:32-1(a)(4), stating:

> The general test for adequacy of the representation is the expertise and experience of the representative's counsel coupled with the typicality of the representative's claims. Laufer, 385 N.J. Super. at 181. See also R. 4:32-2(g) [(requiring the court to appoint class counsel and prescribing the standards therefor)]. The named representative individually must have standing to bring the claims. Rosen v. Continental Airlines, 430 N.J. Super. 97, 107 (App. Div. 2013); Francavilla v. Absolute Res. VI., 478 N.J. Super. 171, 182-83 (App. Div. 2024). After reviewing the qualifications and certifications submitted by [p]laintiff's counsel, the [c]ourt finds that counsel has extensive experience in class action litigation and will adequately represent the interests of the class.
>
> [(Citations reformatted).]

The trial court correctly determined plaintiff established adequacy under Rule 4:32-1(a)(4). Defendants do not dispute plaintiff's counsel has the necessary qualifications to conduct this class action. Nor have defendants

21

asserted plaintiff's interests are antagonistic to the class which would substantively attack a finding of adequacy.

D.

Defendants further contend that plaintiff failed to establish additional requirements under Rule 4:32-1(b) necessary to maintain a class action. Specifically, defendants argue plaintiff did not satisfy section 3 of the rule, which states:

> [T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include:
>
> (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability in concentrating the litigation of the claims in the particular forum; and
>
> (D) the difficulties likely to be encountered in the management of a class action.

A-1236-24

The trial court found plaintiff established at least one of the subsections under Rule 4:32-1(b). After extensively discussing the applicable law, the trial court stated its factual findings:

> The [c]ourt finds that in this matter, the class action is a superior mechanism to other available methods, because joinder of all 852 claims is impracticable and may result in inconsistent rulings. The law favors class actions in situations such as this to prevent inconsistent rulings and undue burden on the judicial system. If each of the 852 consumers that were charged a documentary fee were to bring their claims as a separate action against . . . [d]efendants, it would obviously be inefficient, a burden on judicial resources, and it is likely many of the individual class members would not pursue their claims at all due to the expense or lack of financial ability to do so. Finally, some members of the class may be unaware that they were improperly charged a documentary fee in connection with the purchase of their vehicle. The [c]ourt finds that while the amount of economic damages to the individual members of the Class is significant, the amount is modest in comparison to the expense and burden of individual litigation. For these reasons, the [c]o[u]rt finds that class action is superior to other adjudicatory methods. See Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund., 192 N.J. at 384.
>
> [(Citation reformatted).]

The trial court then articulated the applicable legal principles as they relate to predominance under Rule 4:32-1(b)(3), and applied the law to its factual findings:

23

The [c]ourt finds that the record here demonstrates that the claims arise from the same "common nucleus of operative facts" and raise common questions. "The basic question is whether the potential class, including absent members, seeks 'to remedy a common legal grievance.'" Cadillac, 93 N.J. at 431. In a class-action setting, "[i]ndividual questions of law or fact may remain following resolution of common questions." Lee, 203 N.J. at 520 (quoting Iliadis v. Wal-Mart-Stores, Inc., 191 N.J. 88, 108 (2007)). The court must determine "whether the proposed class is sufficiently cohesive to warrant adjudication by" collective action through a class representative. Ibid. The [c]ourt finds that, in this matter, each transaction that involved an unitemized documentary fee, whether as a result of a sale or lease, financing or not, all involve the same causes of action of an unitemized doc fee and require the same proof—that is, the invoice prepared by [d]efendants. Defendants' attempt to distinguish and argue that [p]laintiff's transaction is "unique" and that there are differing transactions in the proposed class, ignores that the ASP violations, CFA and TCCWNA class claims of [p]laintiff and all class members involve the same legal issues—whether or not [d]efendants charged unitemized documentary and pre-delivery service fees in violation of the ASP [r]egulations. Plaintiff's claims as to the condition of the vehicle sold to her by defendants [are] entirely separate from the class action. To the extent there are subclasses or other contingencies, they may be addressed at the appropriate juncture. The [c]ourt finds that [p]laintiff has established the predominance and superiority factors under Rule 4:32-1(b)(3).

[(Citations reformatted).]

24

The governing case, as referred to by the trial court, is Iliadis, which sets forth the appropriate standard for determining whether predominance exists in a motion for class certification:

> To establish predominance, a class representative must demonstrate "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." R. 4:32-1(b)(3).  That inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."
>
> Some general principles guide us in this "pragmatic assessment."  First, the number and, more important, the significance of common questions must be considered. []"Predominance is not, however, determined by adding up the number of common and individual issues and determining which is greater."[]  Second, a court must decide whether the "benefit from the determination in a class action [of common questions] outweighs the problems of individual actions."  Third, predominance requires, at minimum, a "common nucleus of operative facts."
>
> Notably, predominance does not require the absence of individual issues or that the common issues dispose of the entire dispute.  Individual questions of law or fact may remain following resolution of common questions.  Predominance does not require that all issues be identical among class members or that each class member be affected in precisely the same manner.
>
> [191 N.J. at 108-09 (Third alteration in original) (internal citations omitted).]

As the trial court found, each proffered transaction here includes an unitemized documentary fee and all share the underlying causes of action alleging violations of the ASP regulations, CFA, and TCCWNA. The fact that plaintiff has other causes of action against defendants based on the condition of her vehicle does not defeat a finding of predominance as her class action claims are separated into a partial class action under Rule 4:32-2(d), which provides, in relevant part, that "an action may be brought or maintained as a class action with respect to particular issues."

Thus, the trial court properly concluded that plaintiff met the predominance standard under Rule 4:32-1(b)(3) in granting plaintiff's motion for class certification.

Our review of the record reflects the trial court engaged in a painstaking analysis of Rule 4:32-1(a) and (b) and properly granted class certification. Going forward, it remains plaintiff's burden to prove a violation of the ASP regulations and her entitlement to relief under the CFA and TCCWNA.

## III.

Defendants argue that the trial court "erred in finding that [John] Velez potentially bears individual liability." They contend "[p]laintiff's Buyer's Order was generated using dealership management software licensed from Integex

who represented to Daytona and [John] that their forms would comply with any and all applicable regulations."

In considering John's individual liability the trial court stated:

> With regard to the individual liability of the Velezes, N.J.A.C. 13:21-15.7(c) of the ASP [r]egulations provides that "[t]he dealer, all partners, officers, directors and/or holders of controlling interests shall be individually responsible for the conduct of all business at the dealership and for compliance with all the requirements of the statutes and rules governing the business of buying, selling or dealing in motor vehicles . . . " Here, based upon the deposition testimony of John Velez, one of the owners of Daytona, Mr. Velez was the person responsible for managing the day-to-day operations of Daytona; he delegated the work and supervised the employees; he was the one who decided what fees to charge in each transaction; the software that was purchased and the form of buyer's order to be used. Based upon same, the court finds that Mr. Velez may be held liable under the regulations. In addition, as the owner and individual responsible for setting the policies and procedures related to the charging of unitemized fees, Mr. Velez may be individually liable for CFA violations that are directly attributable to acts undertaken by them through the corporate entity. [Allen v. V & A Bros., Inc., 208 N.J. 114, 117 (2011)].

> [(Omission in original).]

As the court noted, Allen is the determinative case on individual liability for CFA violations. There, the Court stated that "[i]n light of the broad remedial purposes of the CFA and the expansive sweep of the definition of 'person,' it is

27

clear that an individual who commits an affirmative act or a knowing omission that the CFA has made actional can be liable individually." 208 N.J. at 131. The Court further "held that corporate officers and employees could be individually liable pursuant to the CFA for their affirmative acts of misrepresentation to a consumer." Ibid. (citing Gennari v. Weichert Co. Realtors, 148 N.J. 582, 608-10 (1997)).

John testified he managed the day-to-day operations of Daytona, delegating the work to his employees, and supervising them. John conceded he determined the category of service within the "doc fee" and what fees to charge plaintiff and the class members. It was also his decision to use the particular buyer's order form. The trial court did not err in finding John could be held individually liable for violations of the CFA.

## IV.

In her cross-appeal, plaintiff contends the court erred in denying class certification to Jackeline. Plaintiff relies on N.J.A.C. 13:21-15.7(c), which states that "[t]he dealer, all partners, officers, directors and/or holders of controlling interests shall be individually responsible for the conduct of all business at the dealership and for compliance with all the requirements of the

statutes and rules governing the business of buying, selling or dealing in motor vehicles." (Emphasis added).

The trial court declined to find Jackeline personally liable in granting plaintiff's motion for class certification, stating:

> As to [Jackeline], the situation is different. There has been no evidence presented that she had any involvement in the foregoing matters. Her involvement appears to be solely as a co-owner of Daytona. As such, the [c]ourt finds there is no basis to hold [Jackeline] personally liable.

Under N.J.A.C. 13:21-15.7(c), Jackeline can be held personally liable for any violations of ASP regulations. However, applying the Allen analysis as discussed above, Jackeline cannot be personally liable for CFA violations. There was no evidence presented that Jackeline "commit[ed] an affirmative act or a knowing omission that the CFA has made actional." 208 N.J. at 131.

The appeal is affirmed; the cross-appeal is affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1236-24